UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
WILLIAM PINERO,

                    Petitioner,

       - against -

CHARLES GREINER,

                  Respondent.
----------------------------------x

01 Civ. 9991 (DLC)(DFE)

<u>REPORT AND RECOMMENDATION
TO JUDGE COTE</u>

DOUGLAS F. EATON, United States Magistrate Judge.

    William Pinero's habeas petition challenges his 1997 conviction for murder, after pretrial hearings and a jury trial before Justice David Stadtmauer in Supreme Court, Bronx County. On September 5, 1997, Justice Stadtmauer sentenced him to a prison term of 25 years to life.  The Appellate Division affirmed the conviction, *People v. Pinero*, 270 A.D.2d 212, 706 N.Y.S.2d 28 (1st Dep't 2000), *leave denied*, 95 N.Y.2d 856, 714 N.Y.S.2d 7 (N.Y. July 28, 2000).

    Pinero was represented by Marvin Ray Raskin at pretrial hearings and at trial, and on appeal by Brian D. Linder and Erich J. Gleber of the Manhattan firm of Clayman & Rosenberg.  Pinero began this habeas proceeding <u>pro</u> <u>se</u>, but since May 2003 he has been represented by Damond J. Carter of Albany.

    Pinero's first habeas petition was barely timely.  Dated October 15, 2001, it was received by our Court's Pro Se Office on October 22, 2001.  Pinero soon wrote to Judge Cote to request a

1

stay while he returned to state court to exhaust the unexhausted claims in his petition.  The stay was granted on December 13, 2001, and lifted on April 24, 2003, by Judge Cote, who then referred the petition to me.  On October 31, 2005, Bronx Assistant District Attorney Mary Jo L. Blanchard served and filed an Affidavit in Opposition to the Petition; it annexed a Memorandum of Law and Exhibits 1-27.  (I shall refer to any of these exhibits as "Exh. __".)  She also provided transcripts of the state proceedings.[1]  For the following reasons, I recommend that Judge Cote deny the petition.

The proceedings since the 1997 trial have been protracted. The next three pages contain an abridged chronology.

| | |
|---|---|
| 9/5/97 | Sentence and Judgment |
| 3/30/00 | Appellate Division affirmed conviction |
| 7/28/00 | Leave to appeal denied |
| 10/26/00 | The deadline for a certiorari petition expired, and the conviction became final |
| 10/22/01 | First habeas petition (dated 10/15/01) received by our Court (Docket Item # 1) |
| 10/26/01 | The one-year statute of limitations expired |

---

[1] The transcripts are in five volumes.  The page numbering restarts four times.  Vol. 1 contains pp. 1-238, which cover the *Huntley-Wade* hearings on 5/28 and 5/29/97;  Vol. 2 contains pp. 1-243, which cover the *Ventimiglia* hearing on 7/11, 7/14 and 7/21/97;  Vol. 3 contains pp. 1-337, which cover the Voir Dire on 7/21, 7/22 and 7/23;  Vol. 4 contains pp. 1-568, which, after a few more pages from 7/23, cover the first four days of trial (7/28, 7/29, 7/30 and 7/31); Vol. 5 contains pp. 570-1055, which cover the last four days of trial (8/4, 8/5, 8/6 and 8/7/97).  In my Report, any reference to "Tr." which does not give a volume number will refer to the transcript of the trial.

2

| | |
|---|---|
| 11/20/01 | Pinero filed his first *coram nobis* motion in state court |
| 12/13/01 | Judge Cote issued the first *Zarvela* stay (Docket Item # 3) |
| 12/10/02 | Appellate Division denied first *coram nobis* motion |
| 2/26/03 | Leave to appeal denied |
| 3/4/03 | <u>Pro se</u> motion to lift Judge Cote's 12/13/01 stay and to amend petition (with the proposed Amended Petition attached) (Docket Item # 5) |
| 4/24/03 | Judge Cote's order lifting stay and referring the case to Judge Eaton (Docket Item # 12) |
| 5/16/03 | Damond J. Carter filed Notice of Appearance and a motion for a second stay, in order to file a second *coram nobis* motion (Docket Item # 9) |
| 6/27/03 | Judge Eaton issued the second *Zarvela* stay (Docket Item # 11) |
| 6/8/04 | First Department denied the second *coram nobis* motion |
| 8/24/04 | Mr. Carter's motion for a further stay (Docket Items #13 and #14), in order to file a CPL 440 motion (which he did not file until 5/16/05). |
| 9/13/04 | Judge Read dismissed appeal from the 6/8/04 denial of the second *coram nobis* motion (3 N.Y.3d 710) |
| 5/4/05 | Judge Eaton's Order lifting all stays, denying a further stay, and setting a briefing schedule (Docket Item # 15) |
| 5/16/05 | Mr. Carter's CPL 440 motion to the trial judge |
| 6/2/05 | Mr. Carter's motion asking Judge Eaton for permission to withdraw as counsel (Docket Item #17) |

7/7/05  Judge Eaton's Order (Docket Item #19):
       -- denying Mr. Carter's motion to withdraw
       -- granting motion to proceed on proposed
         Amended Petition (in Docket Item #5)
       -- deeming Amended Petition to include the
         new grounds in Mr. Carter's *coram nobis*
         application (but not the claims in the
         440 motion)

7/8/05  Judge Eaton's Order denying Pinero's request for
an extension of time and for appointment of new
counsel

10/31/05  Affidavit of ADA Mary Jo Blanchard in opposition
to the Amended Petition (annexing Memorandum of
Law and Exhibits 1-27) (Docket Item #23)

11/28/05  Mr. Carter's Declaration in support of the
Amended Petition, with letter brief attached
(Docket Item #24)

3/8/06  Motion (dated 3/8/06 but received 5/10/06
because Mr. Carter mistakenly assumed this to be
an ECF case) seeking a stay until a final state
court decision on Pinero's 5/16/05 440 motion
(Docket Item # 25)

4/5/06  Justice Stadtmauer denied the 5/16/05 440 motion
(See document attached to Docket Item # 26.)

7/20/06  Appellate Division denied leave to appeal from
the denial of the 440 motion

8/31/06  Mr. Carter's motion for a further stay, in order
to make yet another 440 motion
(Docket Item # 30)

9/11/06  Judge Eaton's Order denying any further stay
(Docket Item # 31)

9/27/06  Mr. Carter's supplemental letter brief in
support of the Amended Petition (Docket
Item # __)

3/13/07  Mr. Carter's further letter (Exh. A to this
Report)

FACTUAL BACKGROUND

The victim of the murder was Glenn Walker, who had a business selling Christmas trees in a lot at 1925 Bartow Avenue in the Bronx, and a business selling watermelons at 405 Hunts Point Avenue.  Around 3:15 p.m. on November 2, 1994, Walker was in his Hunts Point office with his associate Dirceline Delgado. He was having a telephone conversation with his wife when two men burst into the office.  One man restrained Delgado while the other man shot and killed Walker.  The jury concluded that the man who restrained Delgado was William Pinero. [2]

The defense at trial was misidentification -- that Pinero had been mistakenly identified by Delgado.  Immediately after the murder, she was hysterical and able to give police only a limited description of the shooting and the two perpetrators.  The police investigated for more than seven months; on June 15, 1995, they showed her a photo array and she selected the photo of Pinero. He was arrested on January 30, 1996.  The next morning, she selected him from a lineup.

Delgado's eyewitness testimony was not corroborated by any forensic evidence.  There was, however, a post-arrest statement by Pinero.  Detective Ortiz testified that Pinero gave several

---

[2] Pinero was charged as an accomplice.  The shooter was identified as Michael Kealing; he was arrested but was never prosecuted.  ADA Zigman explained to Justice Stadtmauer that prior to 1997 the shooter began serving a Pennsylvania sentence of more than 70 years, and therefore he could not begin serving any sentence for this 1994 murder unless he lived to be 95. (Vol. 1 5/28/97 Tr. 21.)

versions and ultimately provided incriminating details.  (Tr. 391-423.)  Detective Ortiz testified as follows.  The police arrested Pinero on January 30, 1996 and charged him with the November 1994 murder of Walker.  After receiving *Miranda* warnings, Pinero made the following statements to Detective Ortiz:

Richie Longo had paid $5,000 for the killing of Walker, because Longo "was greedy" and wanted the Bartow Avenue location. Longo paid half the money to "Kenny," a man who had a baby with Longo's niece.  (Tr. 391-93.)  Longo paid the other half of the money to a fat man named "Chubby" or "Chubbs."  "Chubbs" was the shooter.  Pinero wasn't there, he didn't do it.  On the afternoon of the murder, Pinero drove Richie Longo from Manhattan to the Parkchester area of the Bronx.  In Parkchester, Longo made a call from a pay phone and then told Pinero that "everything was taken care of with that guy." (Tr. 395-96.)

Around 10:30 p.m., Pinero asked Detective Ortiz: "If I say I was there, what kind of deal will I get?"  He got no answer. Later, he asked the same question again, and added "[D]o I go home?"  He got no answer.  However, he proceeded to provide several incriminating details.  He admitted that he had parked his car in the Hunts Point area, and he described the building where the murder occurred.  He noted that Walker's "secretary" was present, that Walker was on the telephone, and that Walker

6

exclaimed: "This is it." (Tr. 403-05, 451.) (These were details that the police had previously learned from Walker's widow and from Walker's "secretary" Delgado.) Detective Ortiz asked Pinero: "What did you do?" Pinero replied: "I told you the story. Do I get a deal?" Detective Ortiz asked again: "Who went inside?" Pinero replied: "Chubbs and another guy. Do I get a deal?" At that point, the questioning stopped. (Tr. 401-05.)

Mr. Raskin moved unsuccessfully to suppress Pinero's statement. Justice Stadtmauer denied the motion "in all respects." He ruled that Pinero had understood the *Miranda* warnings given at the time of arrest, and that it was unnecessary to give additional warnings as the evening progressed. He ruled that all of Pinero's statements to Detective Ortiz were voluntary. (Vol. 1 Tr. 236-37.) In this habeas proceeding, Pinero does not challenge those rulings.

The prosecution also introduced evidence that Pinero had been involved in a conspiracy to extort protection money for the right to sell Christmas trees at 1925 Bartow Avenue. (See pp. 40-48, *infra*.) Walker's widow (Tr. 71-73) and Ms. Delgado (Tr. 165-70, 188) testified that Walker had paid money to "some people" including "Frankie Porcaro" in 1992, but had stopped paying in 1993 and 1994. In December 1993, two fires occurred at Walker's Christmas tree lot; the Fire Department determined that both were "nonaccidental." (Tr. 331-58.)

After the November 1994 murder of Walker, George Nash ran a Christmas tree business at the same Bartow Avenue location. Nash testified that his "partner" in that business was Richie Longo, who told him they would have to pay money to a third person: there would be a one-time fee of $10,000, and Nash agreed to pay. Nash testified that the $10,000 was collected from him by Pinero -- $2,500 on December 21, 1994, and $7,500 the next day. (Tr. 498, 505-06.)

At the pretrial hearing (Vol. 2 Tr. 9-14), and in his summation (Tr. 944-54), the prosecutor argued in essence that Pinero's collections from Nash were part of a single extortion conspiracy involving Frankie Porcaro, Richie Longo and Pinero -- encompassing Walker's 1992 payments, the 1993 fires, the November 1994 murder of Walker, and (only seven weeks later) the resumption of payments by Walker's replacement.

The defense's main witness was Pinero's former girlfriend, Stephanie Baldes. She testified that at the time of the murder Pinero was with her and Richie Longo in Longo's car, first at the Riverdale Riding Stables, and then on the way to Long Island. (Tr. 802-04.)

Dr. Sanford Drob, director of psychological assessment at Bellevue Hospital, also testified for the defense. (Tr. 701-71.) He had examined Pinero. He summarized his conclusions at Tr. 728:

8

> . . . [W]hen it comes to solving
> problems, he's . . . grossly impaired.  His
> intellectual functioning overall is in the
> borderline defective range.  He has serious
> problems in attention and concentration
> leading me to believe he is suffering from
> attention deficit hyperactivity disorder.  He
> has problems coping with stress.  He has a
> very low frustration tolerance and he's
> likely to act in a very impulsive way in
> which he doesn't think things through
> carefully when he is put in a stressful or
> difficult circumstance.

<u>PROCEDURAL BACKGROUND</u>

<u>Direct Appeal</u>

Attorneys Brian D. Lindner and Erich J. Gleber submitted a

69-page brief and a 35-page reply brief to the Appellate

Division.  They raised six points:

> Point One:  The admission of evidence
> of uncharged crimes deprived Pinero of his
> due process right to a fair trial since this
> evidence was not relevant for any permissible
> purpose and its prejudicial effect greatly
> outweighed its probative value.  U.S. Const.,
> Amend. XIV, N.Y. Const., Art. I, §6.

> Point Two:  The admission of
> identification evidence tainted by an unduly
> suggestive photographic array, in which
> Pinero's photograph was the only one to have
> the single distinguishing physical
> characteristic mentioned by the complainant,
> deprived Pinero of his due process right to a
> fair trial. U.S. Const., Amend. XIV, N.Y.
> Const., Art I, §6.

> Point Three:  The court deprived the
> defendant of the opportunity to present
> relevant exculpatory evidence when it refused
> to allow defendant to publish his scar to the

jury unless he testified at trial, in
violation of the defendant's due process
right to a fair trial.  U.S. Const., Amend.
XIV, N.Y. Const., §6.

Point Four:  Defendant-Appellant was
denied his due process right to a fair trial
by (A) the prosecutor's cross-examination of
defendant's alibi witness focusing on
juvenile criminal proceedings, and (B) a jury
charge that relieved the people of the burden
to disprove the alibi defense beyond a
reasonable doubt and that equated the jury's
disbelief of the alibi testimony with
conclusive proof of the defendant's presence
at the crime scene.  U.S. Const., Amend. XIV,
N.Y. Const., §6.

Point Five:  The court should have
granted defense counsel's motion for a
mistrial, and the defendant was denied his
due process right to a fair trial, when
Detective Ortiz told the jury that Delgado
had identified the defendant from a photo
array. [3]  U.S. Const., Amend. I, N.Y. Const.,
§6.

Point Six:  William Pinero was deserving
of a less harsh prison sentence than the
maximum sentence of twenty-five years to life
imprisonment.

The Appellate Division unanimously affirmed the conviction

and wrote:

The court properly exercised its
discretion in receiving evidence of uncharged
crimes, not all of which directly involved
defendant himself, as evidence of motive and
as background, completing the narrative of
events.  The challenged evidence, taken as a

---

[3] Point Five was an outdated "*Trowbridge* claim."  *People v. Trowbridge*,
305 N.Y. 471 (Ct. App. 1953), construed New York's then Code of Criminal
Procedure §393-b and and found that it was reversible error to allow a police
officer to "bolster" a victim's identification by testifying that he saw the
victim identify the defendant.  Long ago, *Trowbridge* was superseded by
Criminal Procedure Law §60.25, see *People v. Lagano*, 36 N.Y.2d 71 (1975).

10

whole and in connection with the other
evidence adduced at trial, provided strong
circumstantial proof that defendant and his
companion, acting as agents of a criminal
conspiracy, killed the deceased, a vendor of
Christmas trees, because he stopped paying
protection money. (*see, People v. Ponnapula*,
266 A.D.2d 32, 698 N.Y.S.2d 219).  The nexus
between defendant, the various events, and
the instant crime was clearly established.

Any error in the court's refusal to
permit defendant to display his facial scar
to the jury did not result in prejudice to
him in view of the minimal probative value of
the scar and the fact that defendant made the
jury aware of the scar in any event.  We also
note there was overwhelming evidence of
defendant's guilt.

Defendant's challenge to the alibi
charge is not preserved for our review (*People v. Whalen*, 59
N.Y.2d 273, 280, 464 N.Y.S.2d 454, 452 N.E.2d 212).

We perceive no abuse of sentencing
discretion.

We have considered and rejected
defendant's remaining claims.

*People v. Pinero*, 270 A.D.2d 212, 706 N.Y.S.2d 28 (1st Dep't

2000).

In his letters requesting leave to appeal (Exhs. 7 and 8),

Mr. Linder requested review of the first four Points, emphasizing

in particular Point One (the uncharged extortion conspiracy) and

Point Four B (the instruction on the alibi defense).  On July 30,

2000, Associate Judge Albert M. Rosenblatt ruled that "there is

no question of law presented which ought to be reviewed by the

Court of Appeals."  (Exh. 11; *People v. Pinero*, 95 N.Y.2d 856,

714 N.Y.S.2d 7 (N.Y. 2000)(Table).)

<u>Collateral attacks in state court</u>

In November 2001, Pinero filed a <u>pro</u> <u>se</u> *coram nobis* petition (Exh. 13). It alleged ineffective assistance in that appellate counsel had failed to raise four issues in the appellate briefs: (1) ineffectiveness of trial counsel in failing to request pretrial *Mapp* and *Dunaway* hearings; (2) a *Batson* claim based on the prosecutor's peremptory challenges to two black male potential jurors; (3) error by the trial court when it denied defense counsel's application to remove a particular juror; (4) the court's failure to respond sufficiently to a jury request for a readback of testimony. The Appellate Division denied *coram nobis* in 2002.

In the summer of 2003, Pinero's newly retained counsel, Damond J. Carter, filed a second petition for *coram nobis,* raising three issues that allegedly should have been raised by trial counsel and by appellate counsel. First. Pinero's parents alleged that the court interpreter [4] heard Delgado make statements (during the trial but outside the courtroom) that indicated she was not telling the truth when she testified that Pinero was the man who restrained her. Pinero's parents also

---

[4] Delgado was from Brazil and her native language was Portuguese. Her English and Spanish were quite limited. (Vol. 1, Tr. 31.)

alleged that the interpreter relayed this to trial counsel, but counsel did not relay it to the judge.  Second.  Trial counsel never advised Pinero on the wisdom of accepting or rejecting a plea offer (apparently made in the midst of trial) carrying a sentence of 12 ½  to 25 years.  (It appears that Pinero has now dropped this issue.)  Third.  Trial counsel failed to act on an allegation by Pinero's parents that certain jurors were sleeping during trial.  (It appears that Pinero has now dropped this issue.)  The Appellate Division denied the second *coram nobis* motion in 2004.

In May 2005, Mr. Carter made a CPL 440 motion to the trial judge.  (Exh. 25.)  It was essentially a rehash of Mr. Carter's *coram nobis* motion, but it added one new claim -- that trial counsel had "failed to use material exculpatory evidence in Pinero's defense, where the District Attorney's key witness previously told authorities that person(s) in question had on face mask(s)."  That motion had no basis in the record; [5] it was denied on April 5, 2006 and the Appellate Division dismissed the appeal on July 20, 2006.

On August 31, 2006, Mr. Carter requested me to grant yet

---

[5] In that 440 motion, Mr. Carter stated: "During trial, Pinero witnessed that his attorney possessed a police report in which **Delgado** stated that Pinero was wearing a mask at the time in question."  (Exh. 25, Letter Brief, p. 1, with my emphasis.)  Mr. Carter's only citation is to "Exh. A," which is merely his own Affirmation and contains no factual support or citations to the record.  In the record before me, the idea that the perpetrators wore masks came out of the mouth of **Pinero**, who said that he heard this from Longo, who allegedly heard this from "Kenny."  (See Det. Ortiz's testimony at Tr. 398.)

another stay so he could make a third *coram nobis* motion.  He now alleged that trial counsel failed to realize that the plea offer had proposed a sentence term (12 ½ to 25 years) that would have been "illegal." (Docket Item # 30.)  On September 1, 2006, I refused to grant any further stay. [6]

The habeas petition in our Court

As noted above, Pinero's original petition was barely timely; it was received by our Court's Pro Se Office on October 22, 2001.  By letter dated November 20, 2001, Pinero acknowledged that his petition contained unexhausted claims (primarily ineffective assistance of counsel).  Judge Cote dismissed the ineffective assistance claims for lack of exhaustion, and stayed the remainder of the petition.  (Docket Item # 3.)

On March 4, 2003 Pinero, still pro se, timely requested that the stay be lifted, and submitted his proposed Amended Petition. (Docket Item # 5.)  Judge Cote lifted the stay and referred the matter to me.  After the delay for the second *coram nobis* motion, I ruled on the Amended Petition by memorandum and order dated July 7, 2005 (Docket Item # 19), in which I wrote:

> (a)  I grant Pinero's longstanding motion to proceed on his proposed Amended Petition (Docket Item #5, which contains six [seven] grounds and a memorandum of law as to Grounds One, Two and Six);

---

[6] On September 27, 2006, Mr. Carter sent me a supplemental letter brief, but he has not advised me whether he filed a third *coram nobis* motion.

14

> (b)  I deem that Amended Petition to
> include the claims in Mr. Carter's *coram
> nobis* application (which was exhausted on
> September 13, 2004), but not to include Mr.
> Carter's recent motion in Supreme Court,
> Bronx County.

Therefore, the final version of the Amended Petition [7] raises the

following ten grounds:

> Ground One Petitioner was denied due
> process when the admission of uncharged
> crimes deprived him of a fair trial, where
> the evidence was not relevant for any
> permissible purpose and its prejudicial
> effect greatly outweighed its probative
> value.  U.S. CONST. AMEND. XIV.

> Ground Two Petitioner was denied equal
> protection where the prosecution was allowed
> to peremptor[il]y challenge all male
> p[ro]spective jurors during jury selection.
> U.S. CONST. AMEND. XIV.

> Ground Three Petitioner was denied his
> right to a fair trial when an unduly
> suggestive photograph which singled out
> petitioner by a single distinguishing
> characteristic mentioned by the complainant
> was admitted into evidence. U.S. CONST. AMEND. XIV.

> Ground Four Petitioner was denied his
> due process right to a fair trial when the
> court gave a charge that relieved the people
> of their burden to disprove petitioner's
> alibi defense beyond a reasonable doubt and
> equated the jury's disbelief of the alibi
> testimony with conclusive proof of
> petitioner's presence at the crime scene.

> Ground Five Petitioner was denied due
> process and a fair trial by the prosecutor's
> cross-examination of petitioner's alibi

---

[7] Pinero retained but renumbered some items from his first petition; I
have used his new numbers.

witness by focusing on juvenile criminal
proceedings.

Ground Six Petitioner was denied
effective assistance of trial counsel when
counsel neglected to secure a *Dunaway* hearing
after [he had] requested one and was granted
a hearing.

Ground Seven Petitioner was deprived of
Due Process and a fair trial by the Court's
refusal to allow the Defense to publish his
scar to the jury unless the prisoner
testified.

Ground Eight Petitioner was deprived of
Due Process and a fair trial when the Court
refused to grant a mistrial for the detective
telling the jury that the eyewitness picked
petitioner out of the photo array.

Ground Nine The sentence imposed was
harsh and excessive in violation of the Eight
Amendment.

Ground Ten Appellate counsel was
ineffective for failing to raise a claim of
ineffective assistance of trial counsel due
to counsel's failure to use probative
impeachment material, failure to alert the
trial court to juror misconduct, and
improperly advising petitioner with regard to
his plea options. [8]

On October 31, 2005, Assistant District Attorney Mary Jo L.
Blanchard served and filed an Affidavit in Opposition ("Blanchard
Aff.") which annexed Exhibits 1-27 and a Memorandum of Law.
(Docket Item # 23.)  She argues that the petition should be

---

[8] In his 11/15/05 letter brief at p. 1, n. 1, Mr. Carter wrote: "Here
petitioner does not assert his claim of jury misconduct."  I assume he was
withdrawing the portion of Ground Ten alleging that jurors were sleeping.
That allegation was raised for the first time in the second *coram nobis*
motion.

16

denied for the following reasons:

(a) the petition is untimely because Pinero failed to abide by my June 27, 2003 Order;

(b) his ineffective assistance of appellate counsel claims are exhausted, but are untimely because they do not relate back to his original timely petition;

(c) his ineffective assistance of trial counsel claim is unexhausted, and untimely because it does not relate back to his original timely petition;

(d) his alibi charge claim is exhausted, but does not present a federal constitutional question, and is further barred from review because the state court determination rests on an independent and adequate state ground;

(e) his *Trowbridge* claim is deemed exhausted, but does not present a federal constitutional question;

(f) his claim concerning the cross-examination of his alibi witness is exhausted, but does not present a federal constitutional question, and is further barred from review because the state court determination of that claim rests on an independent and adequate state ground;

(g) his sentencing claim is unexhausted, and does not present a federal constitutional question;

(h) his claim about the extortion evidence (Ground One) is exhausted, but does not present a federal constitutional question;

(i) he exhausted his claim that his in-court identification was tainted by an unduly suggestive photo array, but the state court determination of that claim was not contrary to, or an unreasonable application of, clearly established federal law; and

(j) he exhausted his claim that he was deprived of the right to present a defense (i.e., not allowed to publish his scar to the jury), but the state court determination of that claim was not contrary to, or an unreasonable application of, clearly established federal law.

(Blanchard Aff. pp. 9-10.)

DISCUSSION

A.    The Statute of Limitations Bars Grounds Two and Ten

The statute of limitations for §2254 petitions is set out in 28 U.S.C. 2244(d)(1), which states, in pertinent part:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of --
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> *          *          *
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

In Pinero's case, the New York Court of Appeals denied leave on July 28, 2000; his conviction became final on October 26, 2000.  Therefore **the one-year statute of limitations for a habeas petition expired on October 26, 2001,** as I stated in my 5/4/05 Memorandum and Order at page 1. [9]  His original, pro se petition was dated October 15, 2001 and arrived in our Court on October 22, 2001.  Assuming he gave the petition to prison officials on the same day he signed it, there were only eleven days left to

_____

[9] Five months later, ADA Blanchard argued that the 90-day period to petition for certiorari should not be counted, with the result that "petitioner's whole petition is time barred," citing *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001).  I disagree.  *See Clay v. United States*, 537 U.S. 526, 123 S.Ct. 1072, 1077-1078 (2003); *Doe v. Menefee*, 391 F.2d 147 (2d Cir. 2004).

run.  Therefore any claim that was not contained in his 10/15/01 petition (and not added before eleven more days expired) would be time-barred unless it is subject to statutory or equitable tolling, or fits under a statutory exception (e.g., §2244(d)(2)).

At the outset, ADA Blanchard argues that I should vacate the stay *nunc pro tunc* and dismiss the whole petition (a possibility referred to in Judge Cote's 12/13/01 order) because Mr. Carter did not comply with my 6/27/03 order directing him to send me a prompt report concerning the final decision by the state court.[10] She argues that he was dilatory in pursuing the habeas petition and dilatory in pursuing the state remedy available to him under CPL §440.10.  Ms. Blanchard makes a strong argument, but I decline to recommend dismissing the entire petition so abruptly. However, I do recommend that Grounds Two and Ten be dismissed as untimely.

Pinero (when he was still pro se) complied with Judge Cote's *Zarvela* order by timely returning to federal court within the 30-day time limit.  Therefore, the statute of limitations does not bar any claims that were dismissed by Judge Cote but were subsequently exhausted in a timely fashion.  However, the statute of limitations does bar the claims in the second *coram nobis* motion.  The second *Zarvela* order (Exh. 18, signed by me on 6/27/03) imposed two conditions for timeliness.  Mr. Carter

_____

[10]  See 10/31/05 Mem. pp. 3-8. (She also argues abuse of the writ.)

fulfilled only <u>one</u> of those conditions: he filed the second *coram nobis* motion in state court on or about July 26, thus meeting my deadline of July 28.  But my 6/27/03 order had also directed him to file a detailed affirmation "within 30 days after Pinero receives the final decision by the state court."  The high court of New York issued its final decision on September 13, 2004.  Mr. Carter did not advise me about this within the next 30 days; he did not even attempt to advise me for more than five months. [11] Mr. Carter tries, in vain, to escape the consequences of this fact.

In his "letter brief in support of Petitioner's Reply to the State's Opposition," dated November 15, 2005 (Docket Item # 24), and in his Supplemental Letter dated September 27, 2006, Mr. Carter asserts that he did comply with the second requirement of my 6/27/03 order, by virtue of his August 2004 motion for a further stay.  In that August 2004 motion, he did say (in Docket Item # 14) that "the Petitioner currently has an application for leave to appeal before the New York Court of Appeals."  But that information did not comply with my 6/27/03 order, which required an affirmation "after . . . the final decision," and moreover "an affirmation (i) stating whether he believes he has exhausted all

---

[11]  On March 8, 2006, Mr. Carter filed a motion on our court's Electronic Case Filing ("ECF") system, even though this case had never been designated as an ECF case.  As a result, I did not learn of the motion for two months, as recounted in my Memorandum and Order dated May 10, 2006.

of his state court remedies, (ii) explaining any possible further state court remedies and (iii) stating whether he is filing an amended petition or is resting on his original petition." As a result of Mr. Carter's failure to comply, it was only in May 2005 that I happened to learn that an application thought to be currently pending in state court had been terminated many months earlier. Mr. Carter argues his theory at length, but it pointless to discuss it further. [12]

In another effort to evade the time bar, Mr. Carter tries to take refuge in §2244(d)(1)(D):

---

[12] In a letter to me dated March 13, 2007, attached to this Report and Recommendation as Exh. A), Mr. Carter says that he has decided that he previously made "an unnecessary argument concerning time-bar." He now says:

> [B]ecause counsel timely moved to reopen Petitioner's habeas litigation [actually his August 2004 motion sought further delay of the habeas litigation], irrespective of whether or not counsel should have moved to litigate the post conviction matters which Petitioner ultimately exhausted, . . . the issue of whether Petitioner's claims that he sought to exhaust are time-barred, is misplaced, because Petitioner's habeas petition was properly stayed. . . . Thus, counsel is writing this Court to clarify that Petitioner's position is that none of his habeas claims before this Court are time barred. Counsel's analysis concerning the issue of time bar [wa]s unnecessary, because Petitioner's petition was properly stayed and therefore his time to pursue those remedies did not expire.

I disagree. Regardless of whether I would end the stay *nunc pro tunc* as of 30 days after the Court of Appeals decision (as urged by ADA Blanchard), it is now clear that the claims involved in my 6/27/03 stay never related back to October 2001. Therefore, even if Mr. Carter had sent me a timely report about the Court of Appeals decision, that would not change the ultimate result. The purpose of a *Zarvela* stay is to allow a petitioner to go to state court to exhaust a claim that has been presented to the federal court within the one-year deadline. A *Zarvela* stay does not assure that every stayed claim will be automatically eligible to be evaluated on the merits. Even if a petitioner obeys the conditions of a *Zarvela* stay, the "amended petition does not relate back (and thereby escape AEDPA's one-year time limit) if it asserts a new ground for relief supported by facts that differ in both time and type from those set forth in the original pleading." *Mayle v. Felix*, 545 U.S. 644, 650, 125 S.Ct. 2562, 2566 (2005).

> The limitation period shall run from the
> latest of * * * (D) the date on which the
> factual predicate of the claim or claims
> presented could have been discovered through
> the exercise of due diligence.

He says that the relevant "factual predicate" was Justice Read's

9/13/04 denial of leave to appeal, and that 9/13/04 was "the date

that the claim arose."

Mr. Carter's argument is convoluted. Rather than attempting

to paraphrase it, I will now quote from his 9/27/06 letter at

pp. 2-4:

> The United States Supreme Court having recently
> decided at what time Petitioner's previously
> unexhausted claims begin to run, Petitioner's claims
> regarding the effectiveness of trial counsel are not
> [to] be time-barred. . . . In pertinent part, §2244
> ([d])(1) provides, the one-year statute of limitation
> runs from the latest of: (A) the date on which the
> judgment became final by the conclusion of direct
> review or the expiration of the time for seeking such
> review; . . . (D) the date on which the factual
> predicate of the claim or claims presented could have
> been discovered through the exercise of due diligence.
> . . . The one-year statute of limitations period is
> tolled while properly filed applications for State
> post-conviction relief are pending. Bennett v. Artuz,
> 199 F.3d 116, 120 (2d Cir. 1999). . . . What does or
> does not constitute the *factual predicate* is currently
> unsettled law. Johnson v. U.S., 125 S.Ct. 1571 (2005).
> However, a State court's decision and order in a
> petitioner's case does constitute part of the *factual
> predicate*, for purposes of 28 U.S.C. §2244([d])(1)(D).
> [fn2] Johnson, 125 S.Ct. At 1577; Shannon v. Newland,
> 2005 WL1340841 (9th Cir. 2005). This is the case,
> because as a statute of limitations ordinarily does not
> begin to run until a claimant's cause of action is
> complete and present, it is highly doubtful that
> [C]ongress intended a time limit on pursuing a claim to
> expire before the claim arose. Johnson, 125 S.Ct. at
> 1578; Graham County S[o]il and Water Conservation Dist.
> Et al. v. U.S. Ex Rel Wilson, 125 S.Ct. 2244, 2250-51

(2005); <u>Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferber Corp. Of Cal.</u>, 522 U.S. 192, 201 (1997). [fn3] The text of §2244(d)(1)(D), "clearly links the running of the limitation period to the discovery of the facts supporting the claim or claims presented." *Johnson*, 125 S.Ct. at 1579. Nonetheless, an interpretation that would allow the statute of limitations to run and even expire before the § 2244 (or §2254) claim and its predicate event exist does not comport with [C]ongress' statutory intent. <u>Id</u>. Prior to the final state court decision, a petitioner has no §2244 claim, because he has no state court decision to challenge. <u>Id</u>. Therefore, a petitioner would be unable to obtain relief under that §2244. <u>Id</u>. Although <u>Johnson</u> dealt with 28 U.S.C. §2255, ¶6(4), the counterpart to 2244([d])(1)(D) that applies to habeas-like motions by federal prisoners attacking their sentences, the two provisions are almost identical; and the Supreme Court has interpreted said statute of limitations in concert with one another. <u>Shannon</u> 2005 WL 1340841.

Since a *factual predicate* requires that a petitioner possesses the requisite facts and have knowledge of the basis of the claim, petitioner can avail himself of the *factual predicate* exception, only where he acts with due diligence in presenting such claim to the State courts upon discovery of that factual predicate. [citations omitted] Thus, where petitioner acts with due diligence in presenting his claim to the State courts, the AEDPA's 1-year statute of limitation, runs anew from the date of the State court's decision and order that has the effect of making petitioner's claim exhausted. *Johnson*, 125 S.Ct. at 1574-83. [fn4] *In this case*, this Court, in prior rulings related to this claim, i.e. the Court's September 11, 2006 Decision and Order, repeatedly noted that it is of the position that Petitioner's claims that were not the subject of his direct appeal are untimely. In fact, in the court's aforementioned rulings it noted that it was of the opinion that Petitioner's claim of ineffectiveness is untimely. With all due respect to the Court, under the circumstances of this case, such a decision would result in denial of Petitioner's constitutional right to habeas corpus. Petitioner's ineffectiveness claims, here the subject of Petitioner's supplemental brief were not in existence at the time he filed his habeas

23

petition.  In fact, trial counsel's sworn statement
that he did not advise Petitioner whether to plead
guilty, only that the State made an offer, did not
exist prior to Petitioner's motion to vacate.  Thus,
for this Court to hold that Petitioner's claims of
ineffectiveness are time barred before they were ripe
for review would be in direct contravention of the well
established rule that Congress has never intended that
a statute of limitations can expire before the claim is
ripe for review. [citations omitted].  The Court is
well aware that before Petitioner could present these
claims for review, they must first have been presented
to the state courts; otherwise, there would be no basis
from which to decide whether the state courts had
wrongly interpreted the U.S. Constitution.  Moreover,
any analysis that the state courts' orders are not
factual predicates was wholly rejected by the Supreme
Court in *Johnson*, without any qualifying language, i.e.
that an order that does not vacate a judgment of
conviction is not a factual predicate.

                    *             *             *

         . . . To hold that Petitioner should have brought
a claim prior to its being ripe for habeas review is
unconstitutional.  Therefore, this Court must decide
that Petitioner's claims are timely.

Mr. Carter's 9/27/06 letter at pp. 2-4 (footnotes omitted).

         This argument fails for several reasons.  First, the statute

of limitations does not "run anew" each time a state court makes

a new decision.  The Second Circuit made this clear in *Smith v.*

*McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000):

                  We therefore hold that proper
         calculation of Section 2244(d)(2)'s tolling
         provision excludes time during which properly
         filed state relief applications are pending
         but does not reset the date from which the
         one-year statute of limitations begins to
         run. . . . .  If the one-year period began
         anew when the state court denied collateral
         relief, then state prisoners could extend or
         manipulate the deadline for federal habeas

24

> review by filing additional petitions in
> state court.

Mr. Carter's argument almost mirrors the one made in *Smith* and

rejected by the Second Circuit (except that he doesn't frame it

in terms of equitable tolling).  The following language

from the Second Circuit's opinion applies equally to Pinero's

case:

> Smith claims that he is entitled to
> equitable relief because (1) he could not
> file his federal petition until he exhausted
> his state remedies; and (2) he diligently
> filed his state coram nobis petition and
> then filed his federal habeas petition only
> 87 days after the state denied collateral
> relief. . . . Smith's case does not present
> extraordinary or exceptional circumstances
> warranting equitable tolling.  Smith's
> delays in seeking collateral review of his
> conviction do not show reasonable diligence.
> In addition, the tolling provision of
> Section 2244(d)(2) already accommodates the
> exhaustion requirements that prisoners face,
> so the mere fact that Smith exhausted his
> claims in the coram nobis petition does not
> trigger equitable tolling.  Finally, Smith's
> *pro se* status until March 1997 does not
> merit equitable toiling.  Smith's petition
> therefore was not timely.

*Smith*, 208 F.3d at 17 (citation omitted).

Second, Mr. Carter's argument misconstrues the statutory

phrase "factual predicate" and the cases he cites.  His reliance

on *Johnson v. United States*, 544 U.S. 295, 125 S.Ct. 1571

(2005), is inapposite to Pinero's situation.  Johnson was

convicted on federal drug charges, and received an enhanced

sentence based on two prior state court convictions.

Subsequently,[13] the state court set aside a conviction on which
the enhancement had been based.  Johnson moved under 28 U.S.C.
§2255 to vacate the federal sentence in view of the decision
vacating the state conviction.  He argued that the state vacatur
was a factual predicate which started the one-year statute of
limitations running pursuant to the fourth paragraph of the
§2255 limitations rule (which is almost identical to
§2244(d)(1)(D) but uses the phrase "facts supporting the claim"
rather than "factual predicate of the claim").  The Eleventh
Circuit held that the state-court order was not a "fact"
discovered by Johnson under the fourth paragraph of the §2255
limitations rule, but was properly classified as a legal
proposition or court action obtained at Johnson's request.  The
Supreme Court disagreed with that classification, but came to
the same result by writing:

> We agree with Johnson that the state-
> court vacatur is a matter of fact for
> purposes of the limitation rule in the

---

[13] Johnson's federal conviction was before AEDPA; therefore he was
entitled to the one-year grace period, resulting in a deadline of April 24,
1997 to file a federal §2255 motion.  On April 25, 1997, he filed a motion in
federal court for a 60-day extension of time to file a §2255 motion.  The
District Court denied the motion because the AEDPA period had expired, but
denied it without prejudice to claiming any alternative limitation period
under the statute.
    In deciding the ultimate §2255 motion, the District Court did treat the
state vacatur as a "factual predicate," but it nonetheless denied the motion
because it found that Johnson had not been diligent enough in seeking the
state remedy -- he had waited too long to file his state petition.  Once he
prevailed on his state petition, he returned to federal court with his §2255
motion three months after the vacatur.  But he had not filed his state
petition until February 6, 1998 -- more than three years after entry of
judgment in the federal criminal case (11/29/94) and 21 months after his
federal conviction became final.

> fourth paragraph.  But we also hold that the
> statute allows the fact of the state-court
> order to set the 1-year period running **only
> if** the petitioner has shown due diligence in
> **seeking** the order.

125 S.Ct. at 1577 (emphasis added).

Thus, in *Johnson*, it was the <u>vacatur</u> that provided the basis for the §2255 motion: the vacatur eliminated the state conviction, and hence eliminated the justification for the federal enhancement.  The "factual predicate" was not the mere existence of <u>some</u> state court decision, as Mr. Carter contends. The <u>substance</u> of the state court decision -- the vacatur -- changed the status quo and created a new "factual predicate" within the meaning of the statute of limitations.

Pinero eventually exhausted the *Batson* claim (now in Ground Two) and the claims in the second *coram nobis* motion (now in Ground Ten), but exhaustion did not make them timely.  Ground Two was not raised until the first *coram nobis* motion (filed on 11/20/01).  That was 25 days after the statute of limitations expired.  Ground Ten was not raised until even later (the proposed Amended Petition written in March 2003).

Therefore, unless Pinero can show cause and prejudice for failure to raise the claims sooner, they are time-barred. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546 (1991).  "To establish 'cause,' petitioner must show that some objective external factor impeded his ability to comply with New York's

27

procedural rule." *Restrepo v. Kelly*, 178 F.3d 634, 638-39 (2d Cir. 1999), citing *Coleman* and *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2629, 2646 (1986). Mr. Carter has shown no good cause. Accordingly, Petitioner has not met the requirement to show cause and prejudice to overcome the statutory time bar on those claims.

Moreover, those claims do not relate back to any of the claims raised by Pinero in his first habeas petition -- not to those claims that were already exhausted by October 2001, and not to the claims that were later exhausted and contained in the proposed Amended Petition written in March 2003 (Docket Item #5). In my May 4, 2005 Memorandum and Order I wrote:

> . . . If the proposed Amended Petition contains any claim that was not exhausted before the one-year statute of limitations had run, then Mr. Carter must serve and file . . . a memorandum of law. The memorandum of law must explain why there was good cause for petitioner's failure to exhaust his claims. It must also explain why each such claim should be deemed to "relate back" to the October 2001 petition. See *Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 816 (2d Cir. 2000). Judge Cote's 12/13/01 order explained that, under Rule 15(c)(2), an added claim will relate back to the date of the original federal petition if the claim "arose out of the conduct, transaction or occurrence" that formed the basis of the original federal petition.

In *Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562, 2566 (2005), the Supreme Court addressed the application of Rule

28

15(c)(2) [14] in the context of habeas petitions by state prisoners.  The Court wrote:

> The issue before us is one on which federal appellate courts have divided; Whether, under [Rule 15], Felix's amended petition, filed after AEDPA's one-year limitation and targeting his pretrial statements, relates back to the date of his original timely filed petition, which targeted the videotaped witness testimony. Felix urges, and the Court of Appeals held, that the amended petition qualifies for relation back because both the original petition and the amended pleading arose from the same trial and conviction.  We reverse the Court of Appeals in this regard.  An amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.

In my July 7, 2005 memorandum and order, I wrote:

> In view of *Felix*, it seems likely that, as of October 21, 2001 [actually October 26, 2001], the statute of limitations expired with respect to (a) the *Batson* ground in Pinero's *pro se* proposed Amended Petition, and (b) the new grounds in Mr. Carter's coram nobis application.

Nothing has convinced me otherwise.  Neither Ground Two nor Ground Ten  "arose out of the same conduct, transaction or occurrence . . . attempted to be set forth in the original pleading."  Rule 15(c)(2).  Grounds Two and Ten differ in time

---

[14] F.R.Civ.P.Rule 15(c): "An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . ."

and type from the claims set forth in the original habeas petition.  True, the original petition alleged some failures by appellate counsel; much later, some other failures were alleged in the Amended Petition's Ground Ten, [15] but they are different failures, and hence they do not relate back to the original petition.

Moreover, Ground Two and Ground Ten are based on facts of which Pinero was aware prior to October 26, 2001.  During the trial, he was aware of the peremptory challenges, and aware of his parents' allegation that the interpreter heard Delgado say that she was not telling the truth.  On the direct appeal, Pinero was aware of which issues his appellate counsel's brief was and was not presenting to the Appellate Division.

In sum, Ground Two and Ground Ten should be dismissed as time-barred.

B.  Ground Six

Ground Six alleges trial counsel's failure to push for a *Dunaway* hearing (*Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248 (1979)), even though Justice Stadtmeyer had granted Mr. Raskin's request for such a hearing in an order filed on or about July 22, 1996. (See Exh. 13.)  Mr. Raskin did pursue other

---

[15] Ground Ten asserts that appellate counsel were ineffective because they failed to raise a claim of ineffectiveness of trial counsel in that he (a) failed to use probative impeachment material, (b) failed to alert the trial court to juror misconduct, and (c) failed to properly advise his client of his options regarding a particular plea offer.

types of pre-trial hearing, including the hearing where
Detective Ortiz testified about the contents of Pinero's post-
arrest statements. (Vol. 1 Tr. 63-140.) [16]  The purpose of a
*Dunaway* hearing would be to establish whether there was probable
cause for the arrest.  The police arrested Pinero after the
eyewitness Delgado selected Pinero's photo from the photo array;
that was more than enough for probable cause. [17]  There was no
chance that Mr. Raskin would have gained any benefit if he had
followed up on the opportunity for a *Dunaway* hearing.

In short, Ground Six has no merit, even if we assume that
it was exhausted and that it was raised prior to October 26,
2001.

Grounds Four and Five concern Pinero's alibi defense.  They
raise issues of state law, and do not rise to a violation of the
U.S. Constitution.  I shall discuss Ground Five, and then Ground
Four.

---

[16]  Detective Ortiz testified about the contents of Pinero's post-arrest
statement at both the hearing (Vol. 1, Tr. 63-140) and at trial (Tr. 391-425).

[17]  At page 6 of his 11/15/05 letter brief, Mr. Carter asserts:  "The
problem is that such identification [by Delgado] did not occur until after
Petitioner had been arrested for the crimes in question."  This assertion, at
best, is a semantic one.  Ms. Delgado selected Pinero's photo from the photo
array on June 15, 1995. (Vol. 1, Tr. 35-37.)  That formed the probable cause
for the arrest, which did not occur until seven months later, on January 30,
1996.  Only then was it possible to have a lineup, at which Delgado identified
Pinero for a second time.  At p. 7, Mr. Carter complains that "the jury never
became aware as to how Petitioner became a suspect."  He does not explain how
Pinero would have benefited if that information were presented to the jury.

C.  <u>Ground Five -- The Prosecutor's Cross-examination of
Stephanie Baldes</u>

The defense proffered an alibi defense through Stephanie

Baldes, Pinero's former girlfriend; she testified at Tr. 785-

859.  She said that at the time of the murder, Pinero was with

her and Richie Longo [18] in Longo's car, first at the Riverdale

Riding Stables and then on the way to Long Island.  (Tr. 802-

04.)  She also testified about Pinero's appearance at the

time -- he was 6'1" or 6'2" tall, he "always" wore eyeglasses,

and he had a scar over his left eye. (Tr. 790.)  On recross-

examination, the prosecutor asked Baldes "Do you recall stealing

property May 14, 1986 . . . in Toronto, Canada?" (Tr. 852.)  At

first, the court sustained defense counsel's objection to that

question.  Then at side bar, ADA Zigman said he had been

informed that on June 4, 1986, Ms. Baldes had pleaded guilty in

Toronto to a theft that had occurred on or about May 15, 1986.

As part of his effort to impeach her, he wanted to question her

about the underlying facts of that conviction.  Mr. Raskin

objected.  He advised the court that Pinero (Ms. Baldes's former

boyfriend) had told him confidentially about something that had

occurred in Toronto, but the record was sealed because she had

---

[18] George Nash had testified at Tr. 490-564.  He had told the jury as
follows.  Shortly after the murder, Nash replaced the deceased as the seller
of Christmas trees at 1925 Bartow Avenue.  Richie Longo was Nash's "partner"
and told him that they would have to pay $10,000 for protection.  Nash agreed,
and the money was collected by Pinero.  (Tr. 495-96, 505, 531, 540, 546.)

been 16 years old at the time.  Neither lawyer nor the court had
any documentary evidence about the Canadian proceeding.  The
judge responded: "The jury is entitled to know her background.
I'll change my ruling, but only as to the underlying facts.
. . . I'm permitting some brief questioning on this subject."
(Tr. 855-56.)  ADA Zigman proceeded to question her about her
stealing property in Toronto.  One of ADA Zigman's questions
began:  "Did you admit in court, on June 4th, 1986 . . . [that
you did in fact steal property]?"  (Tr. 857 emphasis added.)
The judge again overruled Mr. Raskin's objections, but the
witness insisted she didn't know what Mr. Zigman was talking
about.  (Tr. 856-59.)

    Admissibility of evidence is fundamentally a matter of
state law. [19]  Only if the trial court judge makes an error so
extreme that it results in a fundamentally unfair trial does a
federal habeas court have the authority to review the state
judge's evidentiary, discretionary ruling.  In *Estelle v.
McGuire*, 502 U.S. 71, 112 S.Ct. 475, 480-81 (1991), the Supreme
Court reiterated this principle:

        We first inquire whether the admission
        of [certain] evidence justified habeas
        relief.  In ruling that McGuire's due

---

[19]  In this instance, the admissibility issue is the extent to which a
questioner may impeach a witness by asking about a juvenile conviction or in-
court proceedings.  Under New York law, for example, it appears that a witness
may not be questioned about a youthful offender adjudication, but may be asked
about acts underlying that adjudication.  *People v. Cook*, 37 N.Y.2d 591, 595,
376 N.Y.S.2d 110, 113 (1975).

> process rights were violated by the
> admission of the evidence, the Court of
> Appeals relied in part on its conclusion
> that the evidence was "incorrectly admitted
> . . . pursuant to California law."  Such an
> inquiry, however, is no part of a federal
> court's habeas review of a state conviction.
> We have stated many times that "federal
> habeas does not lie for errors of state
> law."  Today, we reemphasize that it is not
> the province of a federal habeas court to
> reexamine state court determinations on
> state law questions.  In conducting habeas
> review, a federal court is limited to
> deciding whether a conviction violated the
> Constitution . . . of the United States.

The prosecutor's limited questioning of Baldes did not deprive Pinero of a fair trial. [20]  Mr. Zigman was not able to get the admission he wanted from her, so his purpose was somewhat thwarted in any event.  The jury was free to believe all or part or none of her testimony.  Mr. Zigman's questions about Toronto probably had little effect on the jury, certainly not to the extent to make the trial unfair.  (Indeed, the appellate brief discussed this issue only in terms of New York law, probably because appellate counsel recognized it was not a Constitutional issue.)

---

[20] ADA Blanchard also argues that this issue was procedurally barred -- was not preserved for appellate review because trial counsel's objection was not sufficiently specific to meet the requirements of NYCPL Rule 470.05(2). (Mem. pp. 35-37.)  Arguably, though, the focus should not be on that procedural rule but on the substance of Justice Stadtmauer's ruling -- his was the last reasoned opinion.  See *Serrano v. Fischer*, 412 F.3d 292, 297 (2d Cir. 2005), citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 2594-95 (1991).  And the Appellate Division included this among those "remaining issues" which it had "considered and rejected," which counts as an adjudication on the merits.  However, there is no need to get into that debate; this issue presents no Constitutional issue.

34

D.   Ground Four -- The Judge's Instruction Concerning the
Alibi Defense

The alibi section of the judge's charge was as follows:

> Now, jurors, you've also heard from a
> witness, Stephanie Baldes, who testified
> that at the time of the events in question,
> the defendant was with her and Richard Longo
> at the Riverdale Riding Stables and then
> went by car to Nassau County.  On the basis
> of such testimony, the defendant contends
> that he cannot have committed the crimes
> charged.  Now, this is known as an alibi
> defense.  Alibi is a Latin word meaning
> elsewhere.
>
> As you know, it is the People's
> responsibility to prove beyond a reasonable
> doubt all the elements of each crime
> including the fact that the defendant was
> present at the time and place of the
> incident.  The defendant has no obligation
> to prove or disprove anything, including his
> whereabouts.
>
> The defendant is entitled to have the
> alibi testimony fairly treated like any
> other evidence in the case offered on his
> behalf.  And if the evidence as to alibi,
> either by itself or when taken into
> consideration with all the other evidence,
> raises a reasonable doubt in your minds as
> to this defendant's guilt, he is entitled to
> an acquittal.
>
> On the other hand, if it does not raise
> a reasonable doubt, then, of course, you may
> consider the other elements, whether or not
> the People have proved the other elements in
> the crime on the question of guilt.

(Tr. 999-1000.)  Mr. Raskin had submitted a written request to

charge, which had included a statement that "it is the People

who must disprove the alibi beyond a reasonable doubt." (Exh.

27.) [21]   Pinero's principal criticism -- raised on appeal and
repeated now -- is that Justice Stadtmauer's omission of those
13 words was error, and that the charge as given relieved the
People of the burden of proving Pinero's guilt beyond a
reasonable doubt.  The People argued, and argue now, that under
New York law, Mr. Raskin's objections to the charge were
insufficient. (Mem. Pp. 23-26.)  The judge had previously said
that he would grant Mr. Raskin's request for an alibi charge in
a general fashion; apparently they had discussed it off the
record.  (Tr. 984.)  If the defense thought the portion with the
13 words to be crucial, it had a duty to alert the judge with
more particularized objections, since the judge had not refused
to give any alibi instruction at all.  See *People v. Le Mieux*,
51 N.Y.2d 981, 435 N.Y.S.2d 710 (Ct. App. 1980).  But the
defense did not object until after the verdict.

    The Appellate Division did not address the merits of this
belated objection.  Instead, it ruled that Pinero's "challenge

--------

[21] Under New York law, "The People have the burden of disproving an
alibi beyond a reasonable doubt and, therefore, a charge regarding an alibi
must unequivocally convey that burden to the jury." *People v. Victor*, 62
N.Y.2d 374, 477 N.Y.S.2d 97 (Ct. App. 1984).  But see *People v. Warren*, 76
N.Y.2d 773, 559 N.Y.S.2d 954 (Ct. App. 1990) ("Under the facts presented in
this case, where the only contested issue was whether the accused was, in
fact, the person who committed the crime, we need not reverse merely because
the court did not tell the jury that the People must prove, beyond a
reasonable doubt, *both* that the defendant was the actor present at the crime
scene *and* that he was not elsewhere at the same time."  559 N.Y.S.2d at 956.
See also *People v. Watford*, 146 A.D.2d 590, 592, 536 N.Y.S.2d 835, 836 (2d
Dep't 1989)(the People had the burden to disprove the alibi beyond a
reasonable doubt, but the failure to use those precise words was not
erroneous, where the charge as a whole conveyed the proper burden of proof).

to the alibi charge is not preserved for our review," citing *People v. Whalen*, 59 N.Y.2d 273, 464 N.Y.S.2d 454 (1983).  In *Whalen*, the Court of Appeals clarified New York's procedural rules regarding objections to a court's charge, particularly in the context of identification and alibi.  The Appellate Division's citation of *Whalen* makes clear that these state law procedural rules were the basis for its rejection of Pinero's complaints about the alibi instructions.  A ruling based on an independent and adequate state ground will preclude federal habeas review unless the petitioner makes showings of (a) cause for the failure to follow the state's procedural rules, and (b) prejudice resulting from a federal court's failure to address the claim.  *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936 (1999).  Pinero has made neither showing.  Our Court need not review the alibi charge.

However, even if Pinero had made both showings, it would not serve as a ground for habeas.  As a general rule, jury instructions are governed by state law.  There is ample Supreme Court precedent on this subject.  In *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475 (1991), the Supreme Court summarized the standard by which the federal court may evaluate the Constitutionality of a state court instruction:

> . . . .[T]he fact that the jury instruction was allegedly incorrect under

> state law is not a basis for habeas relief.
> . . . Federal habeas courts therefore do
> not grant relief, as might a state appellate
> court, simply because the instruction may
> have been deficient in comparison to the
> CALJIC model. . . .  The only question for
> us is whether the ailing instruction by
> itself so infected the entire trial that the
> resulting conviction violates due process.
> . . . It is well established that the
> instruction may not be judged in artificial
> isolation, but must be considered in the
> context of the instructions as a whole and
> the trial record.  In addition, in reviewing
> an ambiguous instruction . . . we inquire
> whether there is a reasonable likelihood
> that the jury has applied the challenged
> instruction in a way that violates the
> Constitution.

112 S.Ct. at 482-83 (quotations and citations omitted).  The

Second Circuit has further explained:

> The reviewing court must examine the charge
> as a whole, see *Cupp v. Naughten*, 414 U.S.
> 141, 146-47, 94 S.Ct. 396, 400-01 (1973) and
> assess "whether there is a reasonable
> likelihood that the jury understood the
> instructions to allow conviction based on
> proof insufficient to meet" the standard of
> proof beyond a reasonable doubt.

*Vargas v. Keane*, 86 F.3d 1273, 1277 (2d Cir. 1996), quoting

*Victor v. Nebraska*, 511 U.S. 1, 6, 114 S.Ct. 1239, (1994).  In

addition, there is a long-standing presumption that a jury will

follow its instructions.  See *Watkins v. Sowders*, 449 U.S. 341,

101 S.Ct. 654 (1981) ("Where identification evidence is at

issue, however, no such special considerations justify a

departure from the presumption that juries will follow

instructions."); *Zafiro v. United States*, 506 U.S. 534, 541, 113

38

S.Ct. 933, 939 (1993), citing *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 1708 (1987).

Justice Stadtmauer's charge instructed the jury about the presumption of innocence. (Tr. 990.) He reiterated numerous times that the burden of proof was on the People to prove every element of the crime beyond a reasonable doubt. [22] There is no "reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet" the standard of proof beyond a reasonable doubt.

E.   Ground Nine -- Excessive Sentence

It is not clear whether Pinero is still pressing Ground Nine. In any event, it has no merit. As long as a state sentence is within the range permitted by state law, there is no federal issue. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Justice Stadtmauer sentenced Pinero to the maximum sentence then allowed by New York law for second-degree murder, -- 25 years to life. See New York Penal Law § 70.00(2) and §70.00(3)(a)(i). This sentence did not "amount[] to an improper, arbitrary or capricious abuse of discretion that deprived petitioner of his liberty." *Herrera v. Artuz*, 171 F. Supp.2d 146, 151 (S.D.N.Y. 2001)(quotation and citations omitted).

---

[22] See, e.g., Tr. 986-88, 990, 995, 996, 998, 999, 1003, 1004, 1005-06, 1009, 1011, 1013, 1014.

F.   Ground One -- The Evidence of Uncharged Crimes

The prosecution theory was that the Walker murder was part of a pattern of extortionate activity in which Pinero participated.  In a pretrial motion, the People sought permission to introduce evidence of uncharged crimes:  extortion and arson (by persons other than Pinero) against Walker, and (shortly after Walker's death), extortion against his replacement George Nash.  Nash testified that before he took over the Bartow Avenue lot, his "partner" Richie Longo told him they would have to pay $10,000 to a third party to protect the trees at the Bartow Avenue location.  Seven weeks after the murder of Nash's predecessor, Pinero came to collect "for the big guy," and told Nash that there would be "big trouble" if he did not pay the money. (Tr. 539.)  Nash delivered the $10,000 to Pinero in two installments.  When Nash paid the first installment ($2,500), he wrote up a receipt and William Pinero signed it with his initials "W.P."  (Tr. 503-505; the receipt was placed in evidence at Tr. 504.)

Prior to trial, Mr. Raskin objected on the grounds that there was no evidence linking Pinero to payments from Walker, or to the demands for money from Walker, or to the fires at 1925 Bartow Avenue, and that there was no evidence linking the Nash payments to the Walker situation.  He moved to exclude these uncharged crimes, and argued that they were not probative of

40

anything other than Pinero's character or criminal propensity.

Justice Stadmauer held a *Ventimiglia* [23] hearing over the course of three days prior to jury selection. (Vol. 2, 7/11/97 Tr. pp. 1-50, 7/14 and 7/21/97 Tr. pp. 83-242.)

At the end of the hearing, he ruled that the jury could hear the evidence about the uncharged extortion conspiracy. He said:

> . . . Now, it's true that some of the prior crimes are not connected with this defendant directly. Nor is he charged or was he charged with respect to those crimes. In other words, the extortion of 1992 where $500 was paid at one point and $3000 at another point. The -- if evidence of those extortions [against Walker] come[s] out then those are not necessarily prejudicial to this defendant because he is not identified as the person to whom those payments were made or that he was even involved in those payments so the prejudicial impact against [him] is minimal. The jury isn't going to assume that he is of a criminal personality or that he is a career criminal or that he is an extortionist because of that and of course I am sure Mr. Raskin will point that out to the jury at the appropriate time. However, the testimony is relevant to show that there was a motive for this particular incident, for this particular crime which the defendant is charged. In light of the fact that this defendant was supposedly involved with current extortion threats and under those circumstances it is also an exception of which it comes clearly under

---

[23] *People v. Ventimiglia*, 52 N.Y.2d 350, 438 N.Y.S.2d 261 (Ct. App. 1981).

the Molineux case. [24]

        *        *        *

    . . . The entire history of this
business of fires and threat and firing
bombing is all interwoven within the
incident in question and it shows an absence
of accidents.  It shows a motive and as such
it is an exception to the rule that clearly
comes within the Moline[]ux exception.  Now,
that doesn't mean that the jury . . . can't
reject it or that the defense counsel can't
argue to the jury precisely what he is
arguing to the Court right now.  That it
doesn't relate to his client or that it's
unclear or that it's not sufficient to prove
beyond a reasonable doubt that his client
had anything to do with it . . . .  It is
certainly relevant to explore the nature of
that receipt and the intention for which
that receipt was given by the defendant . .
. .

(Vol. 2, 7/21/97, Tr. 238-42).

    On July 28, 1997, after jury selection, Justice

Stadtmauer issued a written decision on this subject.  (See

Tr. 35-37.)  His written decision [25] said:

    [Proof of intent to kill] is a heavy
burden which is not satisfied by proof that
a person was merely present while a crime
was taking place or even by proof that
defendant had knowledge that certain events
were about to unfold.  Thus, to deny the

---

[24] *People v. Molineux,* 168 N.Y. 264, 293 (Ct. App. 1901), gave rise to
"the Molineux rule":  "Generally speaking, evidence of other crimes is
competent to prove the specific crime charged when it tends to establish (1)
motive; (2) intent; (3) the absence of mistake or accident; (4) a common
scheme or plan embracing the commission of two or more crimes so related to
each other that proof of one tends to establish the others; [or] (5) the
identity of the person charged with the commission of the crime on trial."
Over the years the New York courts have interpreted and expanded on these
basic exceptions, but the *Molineux* guidelines remain good law.

[25] The written order is not in the record before me, but it is partially
quoted by both sides in their briefs to the Appellate Division.

> People the opportunity to offer evidence of
> other crimes, would be to foreclose – in
> advance – any chance that they may have
> [possess] to meet their burden of proof.
> <u>The jury would be left to wander aimless and</u>
> <u>speculate as to just what the defendant was</u>
> <u>doing or intending when Walker was shot</u> [by
> the second man while Pinero allegedly
> restrained Ms. Delgado].

(Exh. 1, Appellant's Br. pp. 9-10, quoting p. 4 of *Ventimiglia*
Order.)

>                 *                 *                 *
>
> [T}he People should be afforded a
> reasonable opportunity at trial to develop
> their theory that the transaction with Nash
> was indicative of [defendant's] involvement
> with the criminal enterprise, [defendant's]
> knowledge and intent to participate in the
> extortion racket, and his not-so-innocent
> presence on the scene when Walker was shot.
> [The evidence would only be allowed] as
> background narrative, to explain defendant's
> motive and shared intent to murder Walker,
> as well as the absence of any mistake or
> accident.

(Exh. 2, People's Br. pp. 12-13, quoting pp. 4-5 of *Ventimiglia*
Order.)

pp. 4-5.)

At trial, the evidence of the extortion scheme was

presented through the testimony of Mr. Walker's widow Donna

Wiehaus Walker (Tr. 52-81), Dircilene Delgado (Tr. 157-324), two

New York City Fire Marshals (Tr. 330-358), and George Nash (Tr.

492-564).

<u>Walker's Widow</u>

Donna Walker testified as follows.  In 1992 "some people"

were threatening to cause problems for her husband and he paid them $500. (Tr. 71.)  She had seen Pinero before, but she couldn't remember where or when.  Her husband never mentioned Pinero to her.  In 1993, some people approached her husband again, asking for $3,000, but he decided not to pay.  After that, his lot was firebombed.  (Tr. 69-72.)

In October 1994, someone else's trailer appeared on the lot.  Her husband thought perhaps it had something to do with the year before. (Tr. 73.)  There had been problems between her husband and "Frankie Boy" Porcaro, who did not like the fact that her husband had a separate business selling watermelons (which competed with Porcaro). (Tr. 77-81.)

On November 2, 1994, around 3:15 p.m., she was in Florida talking on the phone with her husband.  She heard commotion and a loud noise like a scream, and she heard her husband say "This is it."  Then she heard a gun shot.  She heard Delgado say "Donna, call the police," and the phone went dead. (Tr. 55-56.)

### Dircilene Delgado

Delgado testified that she worked for Glenn Walker, and that she always handled the money.  In November 1992, two men came to the tree lot and took Walker away in a car for 40 or 50 minutes.  When they came back, Walker told her to give $500 to the two men.  One of the men was Frankie Porcaro from Frankie Boy's Produce (Tr. 256); she handed him the $500.  The payment

44

was "for protection of the place." (Tr. 165.) After a couple of weeks, during which she and Walker sold many trees, Porcaro came back and demanded more money; at Walker's direction she paid $3,000 to Porcaro. In 1993, "they demanded but he didn't pay." (Tr. 167.) In December 1993, "they set fire on the place twice." (Tr. 170.) Many trees and the wooden fences were burned both times.

There were no payments in 1994. Porcaro told Walker, "I'm going to kill you." (Tr. 312.) In October 1994, Delgado and Walker saw a trailer parked on their lot. They questioned the person in the trailer, who said he had a rent contract and that he would be selling trees on the lot.

She never saw Pinero until November 2, 1994, when he held her down while a second man shot and killed Walker. (Tr. 226.)

### The Two Fire Marshals

Next, two fire marshals testified about the two fires in 1993.

Fire Marshal Richard Harrison testified at Tr. 331-40. He went to the Bartow Avenue location at 3:00 a.m. on December 4, 1993, [26] in response to a report of a fire. There he found a 40-ounce beer bottle that smelled of gasoline; it could have been thrown across the fence onto the Christmas tree lot. He

---

[26] The transcript at Tr. 334 says "September," but at Tr. 364 the judge made clear that the date was December 4, 1993.

determined that the fire had been started by open flame (such as matches or a lighter). He determined that the cause of the fire was non-accidental. (Tr. 337.)

Fire Marshal Michael Owney testified at Tr. 340-58. On December 3, 1993, one day earlier than Harrison, Owney had gone to the Bartow Avenue location at 8:00 a.m. He found that 335 trees were damaged by fire. He eliminated "act of God" and "accidental" as causes of the fire. He found two bottles that had contained a liquid consistent with gasoline, and he smelled gasoline in the area of origin. (Tr. 346.) Walker was not very cooperative with the investigation, but he did give Owney "a name or a partial name." No arrests were made.

After the fire marshals testified, the judge discussed with the lawyers his proposed instruction to the jury regarding the above evidence. (Tr. 359-61.) He then gave this instruction to the jury at Tr. 364:

> . . . I want to give you a brief instruction concerning the testimony that you heard today.
>
> Now, you've just heard the testimony of two fire marshals, regarding their investigations of two fires, one which occurred on December 3d, 1993 at 1925 Bartow Avenue and another which occurred on December 4th, 1993 at the same location.
>
> You must remember that the defendant is not accused of setting those fires and you may not draw any inference from this evidence that this defendant was responsible for those fires.

46

> The testimony is offered by the People
> in order to aid the jury by describing the
> background of the events prior to the
> incident which occurred at 405 Hunts Point
> Avenue on November 2nd, 1994.

### George Nash

George Nash testified at Tr. 492-564.  In late 1994, he began selling trees at 1925 Bartow Avenue.  He agreed with Richie Longo to pay "a protection fee." (Tr. 546.)  On December 21, 1994, seven weeks after the murder of Walker, a man called Billy (whom Nash later identified as William Pinero) came to Nash to collect the money for Richie Longo. (Tr. 505.)  Nash showed the jury a receipt he wrote that night for $2,500; he had written the text, which said: "Sold to Richie Longo.  Paid on account against Richie's Bartow Avenue protect share.  Picked up by Billy."  It was signed "W.P." by William Pinero.  (Tr. 501, 505-08.)  The next morning Nash and Pinero went to Nash's bank. Nash withdrew $7,500 and handed it to Pinero; Nash noted this on the carbon copy of the receipt from the night before.  (Tr. 507.)

The Appellate Division ruled:

> The court properly exercised its
> discretion in receiving evidence of
> uncharged crimes, not all of which directly
> involved defendant himself, as evidence of
> motive and background, completing the
> narrative of events.  The challenged
> evidence, taken as a whole and in connection
> with the other evidence adduced at trial,
> provided strong circumstantial proof that

47

> defendant and his companion, acting as
> agents of a criminal conspiracy, killed the
> deceased, a vendor of Christmas trees,
> because he stopped paying protection money.
> The nexus between defendant, the various
> events, and the instant crime was clearly
> established.

706 N.Y.S.2d at 29 (citation omitted).

In *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475 (1991), McGuire was convicted of murdering his baby daughter.  He was charged with inflicting the very recent injuries that showed on her body.  But the jury also heard "evidence of rectal tearing, which was at least six weeks old, and evidence of partially healed rib fractures, which were approximately seven weeks old." 112 S.Ct. at 478.  Federal habeas was granted by the Court of Appeals for the Ninth Circuit, which ruled that the judge should have precluded the "prior injury" evidence "because no evidence linked McGuire to the prior injuries and no claim had been made at trial that the baby died accidentally."  *Id.* at 479.  The U.S. Supreme Court reversed and wrote:

> We conclude that the evidence of prior
> injuries presented at McGuire's trial,
> whether it was directly liked to McGuire or
> not, was probative on the question of the
> intent with which the person who caused the
> injuries acted.
>
>       *        *        *
>
> [N]othing in the Due Process Clause of the
> Fourteenth Amendment requires the State to
> refrain from introducing relevant evidence
> simply because the defense chooses not to
> contest the [question of intent].

48

                    *              *              *
          We therefore hold that neither the
     introduction of the challenged evidence, nor
     the jury instruction as to its use, "so
     infused the trial with unfairness as to deny
     due process of law." *Lisenba v. California*,
     314 U.S.219, 228, 62 S.Ct. 280, 286. 86
     L.Ed. 166 (1941); see also *Donnelly v.
     DeChristoforo*, 416 U.S., at 643, 94 S.Ct.,
     at 1871.

*Estelle v. McGuire*, 112 S.Ct. At 480, 481, 484.

     In addition to the cautionary instruction at Tr. 364,

Justice Stadtmauer included the following in his final jury

instructions:

          I have also allowed the People to
     introduce evidence that on another occasion
     this defendant committed an antisocial or
     wrong act, [27] other than that which he is
     charged with.  And I'm referring to his
     requesting of money from George Nash.  I
     repeat, as I did at the time such evidence
     was admitted, that the fact that this
     defendant may have committed such an
     antisocial or wrong act is no proof
     whatsoever that he possessed a propensity or
     disposition to commit the crimes charged in
     this indictment or any other crime.  It is
     not offered for that purpose and you must
     not consider it for that purpose.

          Instead, the People offer such evidence
     solely for the purpose of showing that the
     defendant had a motive to commit the crime
     charged.

          Now, although motive is not an element

_____

     [27] The judge used this phrase ("anti-social or wrong act") rather than
"uncharged crimes" or "bad acts."  This was a modification of the language in
the New York Pattern Jury Instructions.  The judge made this change in part at
the request of Mr. Raskin, after both attorneys discussed this part of the
proposed instructions at Tr. 970-81.

                              49

of any of the crimes charged and need not be
proved by the People, nevertheless, I have
permitted evidence of motive, which is up to
the jury to determine whether they wish to
consider it, and I charge you that the
evidence may be considered by you only for
that limited purpose and for none other.

Now, the fact that I allowed you to
hear such evidence should not be considered
by you that I have any opinion as to its
value to prove that purpose.  The
sufficiency of such evidence to prove the
purpose for which it is offered is solely a
question for the jury.  If you find it
insufficient and of no value, disregard it.
If you find it sufficiently probative of
that purpose, you may give it such weight as
you believe it deserves.

If you do consider it, it will then be
your duty to consider that evidence together
with all the other evidence in the case in
deciding whether the People have proved the
defendant guilty beyond a reasonable doubt
of the crimes charged.

(Tr. 1005-07.)

Mr. Raskin's summation elected not to discuss the evidence

of an extortion conspiracy.  ADA Zigman's summation discussed it

at Tr. 933-45 and 953-55.

The jury was aware that it could consider this evidence of

uncharged "wrong acts" on the issues of motive and intent.

Nothing in the instructions allowed a juror to consider this as

"propensity evidence."  Even if a petitioner could show that it

was erroneous to allow a certain item of evidence, this does not

amount to a denial of due process unless "the item was

sufficiently material to provide the basis for conviction or to

50

remove a reasonable doubt that would have existed on the record without it." *Dunnigan v. Keane*, 137 F.3d 117 at 125 (2d Cir. 1998), quoting *Estelle* at 69.  It is also worth noting that, in a Federal trial, Federal Evidence Rule 404(b) permits evidence of uncharged crimes if that evidence is offered for "a purpose other than to prove the defendant's bad character or criminal propensity, . . . and so long as that evidence is not substantially more prejudicial than probative . . . ." *United States v. Myerson*, 18 F.3d 153, 166 (2d Cir. 1994)(internal citations omitted).

G.    Grounds Three and Eight -- "Tainted" Photo Array

Ground Three alleges that Delgado's identification of Pinero in a photo array was tainted because (1) Pinero's photo was "markedly different from the other five photos shown  . . . in terms of tint and color," a difference that caused it to stand out, and (2) his picture was the only photo in the array in which the man had a "thin as opposed to heavy mustache." [28] Detective Ortiz and Police Officer Rosado showed the photo array to Ms. Delgado on June 15, 1995.  At the *Wade* hearing, Mr.

---

[28] Delgado was from Brazil and had only been in the United States for a few years.  Her native language was Portuguese, and though she could communicate in Spanish and English, she was far from fluent.  When the police interviewed her, they conversed in a combination of English, Spanish and hand motions.  (Delgado at Tr. 195-96, 226-227; Munoz at Tr. 610; Ortiz at Vol. 1, H.Tr. 31-32, Rosado at Vol. 1, H.Tr. 214-16.)  Mr. Raskin attacked her identification in part based on the language gap between her and the police. According to Detective Munoz, she indicated to him that the white man had "a slight mustache, a thin mustache."  (Munoz at Tr. 598; see also Delgado at Tr. 196.)

Raskin stated, at Tr. 230, that when he looked closely at the
photo of Pinero in the first array, [29] he was able to discern "a
light mustache," although at first he thought there was none.

Detective William Ortiz and Detective Wanda Rosado
testified; they had shown the photo array to Delgado.    (See
Ortiz at Vol.1, H.Tr. 30-38, 144-161; Rosado at Vol. 1, H.Tr.
182-84.)    After listening to them, and after viewing the photo
array himself, at the end of the hearing, Justice Statdmauer
announced his decision at Vol. 1, H.Tr. 231-34.    He made the
following findings of fact and conclusions of law (among
others):

> . . . Detective Ortiz and Detective
> Rosado . . . show[ed Delgado] a photo array,
> . . . and the witness identified the
> defendant, whose photograph is Number 3 on
> that photo display folder.
>
> Now in looking at this array, it is
> true that the defendant is the only one
> without a heavy mustache, however, he does
> have facial hair of various types and what I
> perceive to be a light mustache.    But what's
> more important is that the general racial
> and facial characteristics of all six of
> these photographs are strikingly similar.
> They all appear to be of the same general
> age, appearance, the same hair coloring, and
> as far as I can see there is no apparent or
> readily apparent racial distinctions among
> these six persons who were displayed in this
> photo array.    The skin coloring is the same.
> The eyes are the same.    All of them have
> more or less the same type of eyebrows.    I

_____

[29] After she had picked Pinero, they showed her a second array, but she
did not choose any of the pictures in that one. (Pinero's photo was not in the
second group.)

would say all except number two have some
type of beard around the chin area.

I see nothing suggestive insofar as
this photo array is concerned and there is
nothing to suggest in the testimony adduced
at the hearing that the police in any way
engaged in any kind of improper conduct in
order to suggest to the witness to select
the defendant's photograph from this photo
array.

[He then proceeded to discuss the
lineup, which he found was "perfectly
fair."]

So it is the judgment of this court
that the People have shown by clear and
convincing evidence that the identification
procedure used by the police was in no way
suggestive, was totally reliable and the
witness will be permitted to make an in-
court identification of the defendant as the
person who was involved in this crime[.]

On appeal, Mr. Linder's brief raised the suggestiveness of
the photo array as Point Two. The Appellate Decision did not
expressly address this issue, but at the end of its decision
stated: "We have considered and rejected defendant's remaining
claims." [30] This is an "adjudication on the merits" for purposes
of §2254 "even [though] the state court does not explicitly
refer to either the federal claim or to relevant federal case
law." See *Howard v.* Walker, 406 F.3d 114 (2d Cir. 2005), Sellan
*v. Kuhlman*, 262 F.3d 303, 312 (2d Cir. 2001). Therefore, the

---

[30] Mr. Linder's 5/30/00 letter to Judge Albert M. Rosenblatt requesting
leave to appeal did not discuss the identification issue substantively, but it
did specifically refer to Point 2 of the Appellate Brief and Reply Brief.
Therefore it is exhausted, not abandoned.

federal habeas court may address the claim asserted.

There is ample Supreme Court precedent on when the suggestiveness of pretrial identification procedures, such as photo arrays and lineup, taint the in-court identification process.  "[Reliability] is the linchpin in determining the admissibility of identification testimony . . . ." *Manson v. Braithwaite,* 432 U.S. 98, 97 S.Ct. 2243 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972).  The first step is to determine whether the array is impermissibly suggestive, that is, "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Neil*, 93 S.Ct. at 381, *citing and quoting Simmons v. U.S.*, 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1967).  Here, Justice Stadtmauer found that the photo array was not suggestive at all, and that there was no "improper conduct" on the part of the police in creating it or presenting it to Delgado.  There is no reason to disagree with that conclusion, let alone to call it unreasonable.

Ground Eight was in the original petition but was not addressed in the recent habeas papers.  It refers to testimony that was stricken.  Hence Ground Eight has no merit.

H.  <u>Ground Seven -- The Scar</u>

Ground Seven alleges that Pinero "was deprived of Due Process and a fair trial by the Court's refusal to allow the

54

Defense to publish his scar to the jury unless petitioner

testified."

Stephanie Baldes's testimony (Tr. 786-859), included the

following exchange at Tr. 790:

> MR. RASKIN:  While you lived with Mr.
> Pinero, from January of 1994 till May of
> 1995, did he ever have a moustache?
>
> THE COURT: A what?
>
> MR. RASKIN: Moustache.
>
> THE COURT: Moustache.
>
> MS. BALDES:  No, he never did.
>
> MR. RASKIN:  Did he wear glasses?
>
> MS. BALDES:  All the time.
>
> MR. RASKIN:  Did he have any
> distinguishing marks or features on his
> face?
>
> MS. BALDES:  Yes, he has a scar above
> his left eye.
>
> MR. RASKIN:  How tall is Mr. -- how
> tall was Mr. Pinero when you lived with him
> from January of '94 to May of '95?
>
> MS. BALDES:  Six-one, six-two, around
> there.

After Ms. Baldes finished, but before the defense rested, Mr.

Raskin addressed Justice Stadtmauer about Pinero's scar:

> MR. RASKIN: There's been testimony
> about detectives and notations about any
> scars on Mr. Pinero's head.  There has been
> testimony they didn't observe any.  The
> testimony by Ms. Baldes is he has a scar
> over his left eye.  It is my application

that the scar be published to the jury and
with my client being allowed to walk in
front of the jury and let them see the scar.
And I will not be calling my client to
testify.

          *        *        *

I do wish to publish the scar on the head.
The jury can't see it from where they are.
. . . and then I intend to rest.

    THE COURT: [Mr. Zigman's] objection is
sustained.

       It is my view that this is
demonstrative evidence which is testimonial
in nature. We have no idea when that scar
was created or whether it was there at such
time as you claim the detective should have
seen it [more than a year ago].

          *        *        *

       Then if this defendant wishes to
exhibit that scar, then he's going to have
to subject himself to cross-examination of
the District Attorney. It's testimonial in
nature, and as an alternative, I would
suggest that if you have a photograph of
defendant that was taken at a certain
particular time, you can offer that
photograph in evidence if you want. But I
will not permit that type of a
demonstration.

          *        *        *

    MR. RASKIN: Judge, I respectfully
except. . . . It is not testimonial in
nature and to deny me this request may be
error. . . .

    THE COURT: I believe that it is
testimonial and that the District Attorney
has a right to question him about it. If
you want to put him under oath, and then let
him testify when he got that scar or how he

> got it or whatever, then that's another
> matter.  But at this point, I will not
> permit the exhibit of that scar in front of
> the jury.
>
>               *          *          *
>
> You can argue to the jury that they
> should believe her testimony that he had
> this scar.  That's up to you.

Mr. Raskin did argue this to the jury at Tr. 938-39.

In essence, the judge ruled that a foundation was lacking. That was a issue of New York law.  Justice Stadtmauer also opined that it would be "testimonial" if Pinero were to walk in front of the jurors to show them his scar.  Under federal law, including Supreme Court precedent, that may be incorrect.  See *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392 (1976); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764 (1973). Even so, a defendant does not have a right to have the jury see every possible bit of evidence.  The trial judge always has discretion regarding evidentiary rulings.  *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 1732-33 (2006).

On appeal, Mr. Linder's brief argued that the decision violated Pinero's right to a fair trial, citing *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142 (1986), and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1973).  But *Crane* and *Chambers* were clarified by a Supreme Court decision the year before Pinero's trial, namely, *Montana v. Egelhoff*, 518 U.S. 37, 116 S.Ct. 2013, 2021-22 (1996), which said:

> Thus, the holding of *Chambers* -- if one can
> be discerned from such a fact-intensive case
> -- is certainly not that a defendant is
> denied "a fair opportunity to defend against
> the State's accusations" whenever "critical
> evidence" favorable to him is excluded, but
> that erroneous evidentiary rulings can, in
> combination, rise to the level of a due
> process violation.
>
>         *                *                *
>
> [T]hat opinion makes perfectly clear that we
> were *not* setting forth an absolute
> entitlement to introduce crucial, relevant
> evidence. . . . *Crane* does nothing to
> undermine the principle that the
> introduction of relevant evidence can by
> limited by the State for a "valid" reason .
> . . .

Justic Stadtmauer did not rule contrary to, or unreasonably

apply, Supreme Court precedent.  Neither did the Appellate

Division when it said:

> Any error in the court's refusal to
> permit defendant to display his facial scar
> to the jury did not result in prejudice to
> him in view of the minimal probative value
> of the scar and the fact that defendant made
> the jury aware of the scar in any event.  We
> also note that there was overwhelming
> evidence of defendant's guilt.

706 N.Y.S.2d at 29.

## CONCLUSION AND RECOMMENDATION

For all the reasons set forth above, I recommend that Judge

Cote deny Pinero's habeas petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the

Federal Rules of Civil Procedure, any party may object to this

recommendation within 10 business days after being served with a copy, i.e., **no later than June 14, 2007,** by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Denise L. Cote, U.S.D.J. at Room 1040, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) *(per curiam)*; 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to the District Judge.

Douglas F. Eaton

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007
Telephone: (212) 805-6175
Fax: (212) 805-6181

Dated: May 25, 2007
       New York, New York

Copies of this Report and Recommendation (and of Exhibit A, Mr. Carter's 3/13/07 letter to me) are being sent to:

Damond J. Carter, Esq.
P.O. Box 6365
Albany, NY 12206

59

Mary Jo L. Blanchard, Esq.
Assistant District Attorney
198 East 161st Street
Bronx, NY 10451

William Pinero, 97A6053
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Hon. Denise L. Cote

Damond J. Carter, Esq.
P.O. Box 6365
Albany, New York 12206
(518) 438-1676

March 13, 2007

Honorable Douglas F. Eaton, U.S.M.J.
United States District Court
500 Pearl Street, Room 1360
New York, NY 10007-1312

RE: Pinero v. Griener
Docket No. 01-CV-09991 (DLC)(DFE)
Clarification

Dear Judge Eaton:

I am writing to make a clarification as to Petitioner's position regarding this habeas matter and to request oral arguments on this matter. In speaking with Petitioner it came to counsel's attention that an unnecessary argument concerning time-bar was made in counsel's analysis. At the time counsel moved to reopen Petitioner's habeas litigation in this Court, the court took issue with counsel's diligence in pursuing Petitioner' s post conviction motion during Petitioner's request to reopen his habeas litigation before this Court. As the record shows, that delay was an isolated incident.

Nonetheless, because counsel timely moved to reopen Petitioner's habeas litigation, irrespective of whether or not counsel should have moved to litigate the post conviction matters which Petitioner ultimately exhausted, while awaiting the Court's response to counsel's request to reopen Petitioner's habeas matters, the issue of whether Petitioner's claims that he sought to exhaust are time barred, is misplaced, because Petitioner's habeas petition was properly stayed. Petitioner ultimately amended his habeas petition to add those claims. Thus, counsel is writing this Court to clarify that Petitioner's position is that none of his habeas claims before this Court are time barred. Counsel's analysis concerning the issue of time-bar us unnecessary, because Petitioner's habeas petition was properly stayed and therefore his time to pursue those remedies did not expire.

Additionally, counsel respectfully requests that Petitioner either be granted an evidentiary hearing or oral arguments on this matter. Thank you.

5/25/07 – I deny Petitioner's requests for an evidentiary hearing or oral argument. See today's Report and Recommendation to Judge Cote.
Douglas F. Eaton

Sincerely,

Damond J. Carter

Damond J. Carter, Esq.

cc: Mary Jo. Blanchard, ADA
William Pinero DIN 97-A-6053

Exhibit A